**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MICHAEL V. ROBERTS,

|                                 | Plaintiff, | CIVIL ACTION NO. 13-CV-1990 |

v.

OFFICER MATT NIEBEL;
OFFICER WILFREDO RAMIREZ;
OFFICER CHRISTOPHER A. CORTAZZO;
OFFICER JAMES T. KENNEDY; and
THE CITY OF READING,

Defendants

**Henry S. Perkin, M.J.**                                               **January 6, 2015**

<u>**MEMORANDUM**</u>

This matter is before the Court on Defendants City of Reading, Officer Matt Niebel, Officer Wilfredo Ramirez, Officer Christopher Cortazzo and Officer James T. Kennedy's Motion for Summary Judgment on Plaintiff's Claims Against Defendants and the Counterclaim of Officer Kennedy Against Plaintiff, which motion was filed August 1, 2014. Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment was filed September 15, 2014. With leave of Court, Defendants City of Reading, Officer Wilfredo Ramirez, Officer Christopher Cortazzo, Officer Matt Niebel, and Officer James T. Kennedy's Reply Brief in Support of Their Motion for Summary Judgment was filed October 6, 2014. Having reviewed and considered the contentions of the parties, the Court is prepared to rule on this matter.

**Procedural History**

On April 15, 2013, Plaintiff Michael V. Roberts ("Roberts") initiated this matter by filing a civil rights Complaint pursuant to 42 U.S.C. §1983 against Defendants Officer Matt Niebel ("Officer Neibel"), Officer Wilfredo Ramirez ("Officer Ramirez"), Officer Christopher A. Cortazzo ("Officer Cortazzo"), Officer James T. Kennedy ("Officer Kennedy"), and The City of Reading ("Reading") in the United States District Court for the Eastern District of Pennsylvania.

According to his Complaint, Roberts contends that the named Reading police officers use of force violated his rights under the Fourth Amendment to the Constitution of the United States to be free of excessive and unnecessary force when being taken into custody by law enforcement officers.  More specifically, Roberts contends that on or about shortly after midnight August 31, 2011 these Reading police officers used excessive and unnecessary force by firing their service revolvers over and over again into his back, as he laid face down in his car following a car chase.

On July 8, 2013, Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint was filed in this matter.  With leave of Court, Defendants filed a counterclaim on behalf of Officer Kennedy on October 2, 2013.  In the counterclaim, Officer Kennedy contends that he was assaulted when Roberts struck him with his vehicle, and continued to drive with him on the hood of the vehicle.

The parties engaged in discovery and the Court, by virtue of its April 14, 2014 Amended Rule 16 Scheduling Order, directed that all dispositive motions (including a separate, short and concise statement of material facts) be filed on or before August 1, 2014.

2

### Facts

Based upon the record papers, exhibits, depositions, and the parties' statements of the facts,[1] the pertinent facts to this Court's determination are as follows:

On August 30, 2011, Roberts, who was under the influence of various medications, imbibed approximately three to six shots of vodka while he was at Al's Diamond Cabaret, a gentleman's club located in Reading Pennsylvania. At some point, Roberts was instructed to leave Al's Diamond Cabaret, and he was escorted out by staff. A bouncer flagged down Officer Hutchinson, who was on duty in his patrol car, and advised him that Roberts had been thrown out of the bar, was highly intoxicated, got in his vehicle (a black Ford Edge), and drove away.

Based on this information, Officer Hutchinson began following the Roberts vehicle, and observed it swaying in and out of the travel lane. Officer Hutchinson activated his lights, sirens, and air horn to initiate a traffic stop. Roberts initially would not stop, but eventually did pull his vehicle over. After Roberts pulled over, Officer Hutchinson approached the Roberts vehicle on foot, instructed Roberts to turn off his car, and roll down his window. Roberts did not comply, and, instead, drove away at a high rate of speed. Officer Hutchinson began a pursuit of the Roberts vehicle, and Roberts began driving in a dangerous manner at a high rate of speed. Because of Roberts's dangerous driving, Officer Hutchinson broke off his

---

[1]    In conjunction with the filing of their motion for summary judgment on August 1, 2014, Defendants submitted their statement of uncontested material facts. Roberts responded to this statement of uncontested facts on September 15, 2014 when he filed his response in opposition to the motion for summary judgment. In so doing, Roberts admitted most of the facts submitted by Defendants. The admitted facts are included within this Memorandum.

pursuit.[2]

Officer Dinger and his trainee, Officer Sneeringer, who were backing up Officer Hutchinson, and had participated in the pursuit of Roberts, noticed a black SUV with its brake lights flashing down Schmecks Lane off of Route 12.  Officer Santiago, who was also backing up Officer Hutchinson, also noticed a black SUV pulled over on Schmecks Lane.  Officer Ramirez, who also responded when Officer Hutchinson radioed in the pursuit of Roberts, also identified a black SUV with its brake lights on located off of Schmecks Lane.  All of the responding officers proceeded to a Sunoco gas station approximately an eighth of a mile past Schmecks Lane to make a U-turn to investigate the black SUV seen down Schmecks Lane.  All four police vehicles proceeded back to Schmecks Lane, and upon seeing the black SUV, Officer Hutchinson notified his fellow officers that the black SUV was in fact the vehicle he had been pursuing, i.e. the Roberts vehicle.

Officer Ramirez was the first police vehicle to enter Schmecks Lane.  Officer Ramirez turned on his spotlight and immediately thereafter, Roberts began to drive his vehicle down Schmecks Lane.  Officer Ramirez followed Roberts, sounding his air horn and emergency siren.  Roberts did not stop his vehicle.  Officer Santiago proceeded with his police vehicle down Schmecks Lane after Officer Ramirez.  Officer Dinger and Officer Sneeringer were behind Officer Santiago in their own police vehicle, proceeding down Schmecks Lane.

Roberts drove his vehicle into a residential backyard, and got stuck in a flower bed.  Officer Ramirez exited his police vehicle, drew his gun, and walked to the front driver's

---

[2]  According to Officer Hutchinson, once his police vehicle displayed a speed of 90 mph, he decided to discontinue the pursuit.

4

side of the Roberts vehicle.  Officer Santiago exited his police vehicle after Officer Ramirez, proceeded to the passenger side of the Roberts vehicle, and drew his weapon while yelling commands at Roberts to shut off the vehicle.  Officer Dinger and Officer Sneeringer exited their police vehicle and proceed to the front of the Roberts vehicle with their weapons drawn, also shouting commands to Roberts for him to shut off his vehicle.

Instead of obeying the officers' verbal commands, Roberts was revving the engine in an attempt to free his vehicle.  The officers continued to give Roberts verbal commands, instructing him to get out of the vehicle, and show his hands, but Roberts continued to rev the engine, causing the front wheels to spin.  Roberts's vehicle proceeded to gain traction, and once freed, Roberts drove his vehicle directly at Officer Ramirez, Officer Dinger, and Officer Sneeringer, putting them in fear of being struck.  Officer Dinger, in an attempt to disable Roberts's vehicle, fired shots at the front tire and drive train.  Officer Ramirez, in fear of being struck by Roberts, jumped out of the way of the moving vehicle, and fired shots aimed towards the driver's side of the vehicle.  Roberts continued to drive his vehicle back up Schmecks Lane, with Officer Ramirez giving chase on foot.

At this time, Officer Cortazzo, Officer Kennedy, and Officer Niebel, arrived on the scene in an unmarked Ford Explorer.  As they proceeded down Schmecks Lane, they heard gunshots fired.  Officer Kennedy believed that his fellow officers already on scene were taking on gunfire.  The Roberts vehicle was seen driving directly toward the unmarked Ford Explorer at a speed of approximately 25-35 miles per hour.  Officer Niebel exited the Ford Explorer, and began to run towards the road following Roberts, who was still attempting to flee in his vehicle. Officer Kennedy also exited the Ford Explorer from the driver's side passenger door.

5

According to Officer Kennedy's deposition testimony, once he exited the Ford Explorer, he saw the Roberts vehicle coming towards him, and fearing that he would be run over, he jumped up, and landed on the hood of the Roberts vehicle.  The Roberts vehicle continued to move.  Fearing for his life, Officer Kennedy fired shots through the windshield of the Roberts vehicle.  Officer Kennedy then jumped from the hood of the Roberts vehicle, and fired additional shots at the driver's side of the vehicle as it continued to drive away.

Roberts drove his vehicle over a metal fence, and crashed into a chicken coop. Officer Niebel, who continued to pursue the Roberts vehicle on foot, came up on the passenger side front of the vehicle, drew his weapon, and repeatedly gave verbal orders directing Roberts to turn off his vehicle and show his hands.  Officer Niebel saw that Roberts was sitting up straight in his vehicle, and had his hands on the steering wheel.  Roberts ignored the verbal commands of Officer Niebel.  Officer Kennedy also pursued the Roberts vehicle on foot, and came up on the passenger side with his weapon drawn.  Officer Cortazzo exited the Ford Explorer and ran to the Roberts vehicle on foot, proceeding to the rear driver's side of the car.  Upon approaching the rear of the Roberts vehicle, Officer Cortazzo slipped and fell behind the vehicle.  Despite being surrounded by Officers Niebel, Kennedy, and Cortazzo, Roberts continued to rev the engine in an attempt to free his vehicle as he had done previously.

Roberts refusal to comply, continued revving of the engine, and concern for their own safety and that of their fellow officers, led Officer Cortazzo, Officer Niebel, and Officer Kennedy to fire shots at the Roberts vehicle.[3]  According to Officer Niebel, he fired a series of

---

[3]        Officer Kennedy testified during his deposition that when Officer Cortazzo was in the rear of the Roberts vehicle, he observed the rear brake lights and reverse lights illuminate on the Roberts vehicle.  Officer Kennedy also heard the engine revving up on the Roberts vehicle.  Because he was in fear that Roberts was going to

rounds, and then saw Roberts fall to his right over the center console of the vehicle at which time he and the other officers ceased fire.  The officers maintained a position of cover until they were able to get the passenger side door open, secure the Roberts vehicle, and pull Roberts from his vehicle.  Officer Neibel advised a resident of the area to call 911.

Roberts was taken to Reading Hospital where he received treatment, including surgery on his right hand, treatment for clavicle and scapular fractures, and embolization. Roberts was stable for discharge to police custody on September 5, 2011.  Officer Kennedy was taken to Reading Hospital where he was evaluated and received treatment for a contusion to his knee as a result of being struck by the vehicle Roberts was driving.

---

kill or injure Officer Cortazzo, or another officer coming to assist, Officer Kennedy fired his weapon through the passenger side of the Roberts vehicle.

Officer Neibel testified at his deposition that following the crash into the chicken coop, he observed Roberts sitting up straight in the vehicle and it appeared that Roberts was trying to put the vehicle in gear or change gears.  The engine of the Roberts vehicle was still accelerating.  The tires were trying to move, and the Roberts vehicle was rocking back and forth as if it was stuck on something or if it was hung up at some point on the chicken coop or the fence on the ground.  He continued to give Roberts orders, and he did not comply.  Officer Neibel then saw the reverse lights of the vehicle go on, and noticed that Officer Cortazzo was in the rear of the vehicle.  He thought the Roberts vehicle was going to back up over Officer Cortazzo, so he fired a series of gunshots through the passenger side front area of the vehicle towards the driver.

Officer Cortazzo testified at his deposition that following the crash, he could hear engine on the Roberts vehicle revving at a high RPM.  Officer Cortazzo observed the wheels spinning, and it was his belief that Roberts was trying to get free and continue.  In fact, while Officer Cortazzo was behind the Roberts vehicle, and in the process of trying to get up, he observed the white backup lights come on.  Because Officer Cortazzo feared he was going to be run over, he fired his weapon in an effort to stop the threat.

Officer Ramirez testified at his deposition that as he was approaching the Roberts vehicle after it had crashed into the chicken coop, he saw the reverse lights illuminated on the vehicle and could hear the engine revving.  Officer Ramirez testified that Roberts was attempting to free himself again in an effort to get away from the police.

Officer Santiago testified at his deposition that after Roberts crashed into the chicken coop, Roberts was still trying to rev the engine in an attempt to free his vehicle.  Officer Santiago stated that because Roberts "was still trying to rev the engine, . . . we grabbed him and pulled him out of the vehicle."

Officer Hutchinson testified at his deposition that he heard the engine of the Roberts vehicle revving in an attempt to free itself from the accident into the chicken coop.

Roberts admits that when Officers Ramirez, Neibel, Cortazzo, and Kennedy fired their weapons on August 31, 2011, each of them were in fear for his own life as well as the lives of their fellow officers.  In addition, the Pennsylvania State Police completed a thorough investigation of the incident, including forensic testing and numerous interviews, and determined that throughout the course of the incident, Roberts displayed an extreme disregard for the safety and life of all of the officers involved in the incident.

On March 30, 2012, Roberts pled guilty to aggravated assault of a police officer, recklessly endangering another person, fleeing and eluding police, and driving under the influence.  Roberts accepted a sentence of 3 years and 3 months to 7 years for those crimes.  In his statement that accompanied his request to enter a guilty plea, Roberts set forth the factual basis for his plea by stating that he "knowingly caused bodily injury to Officer Kennedy when [he] failed to stop [his] car and hit him."  Roberts also admitted that he was driving his car while intoxicated, and that he failed to stop his car after both visual and auditory signals by police to do so.  Roberts further admitted that "[w]hile [he] attempted to flee [he] endangered the officers, [and] could have seriously injured them."

### Standard of Review

Summary judgment is appropriate where the record and evidence, taken in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).  The moving party has the

initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Anderson, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must cite "to particular parts of materials in the record" showing that there is a genuine dispute for trial.  Fed. R. Civ. P. 56(c).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim.  Celotex, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine dispute as to any material fact, then summary judgment is proper.  Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  Jones v. Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting Celotex, 477 U.S. at 325).

## Discussion

### Heck v. Humphrey

Initially, Defendants contend in their summary judgment motion that Heck v. Humphrey, 512 U.S. 477 (1994), bars Roberts's Fourth Amendment excessive force claim. Defendants claim that this § 1983 action and the criminal convictions are incompatible because Roberts pled guilty to aggravated assault and recklessly endangering another person. More specifically, Defendants assert that:

> [b]ecause Plaintiff pled guilty to aggravated assault and recklessly endangering another person – thus admitting that his criminal actions endangered the lives of the Defendants, he cannot now contend that the resulting force used by the officers to stop his deadly actions, was unjustified. Rather, as a matter of law under Heck and its progeny, Plaintiff cannot have it both ways. Namely, he is barred from now claiming in his civil case that deadly force was not necessary, when he previously conceded in the criminal case that it was. Thus, as a matter of law, the force used by Officers Kennedy, Cortazzo, Niebel and Ramirez cannot be deemed excessive and summary judgment must be granted in their favor.

See Defendants' Brief at 6.

In Heck, the United States Supreme Court stated that:

> [I]n order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can

10

> demonstrate that the conviction or sentence has already been
> invalidated. But if the district court determines that the plaintiff's
> action, even if successful, will not demonstrate the invalidity of
> any outstanding criminal judgment against the plaintiff, the action
> should be allowed to proceed, in the absence of some other bar to
> the suit.

Heck, 512 U.S. at 487 (emphasis in original).

The United States Court of Appeals for the Third Circuit has considered the application of the Heck doctrine to an excessive force claim made by a plaintiff, who was previously convicted of resisting arrest and assaulting federal officers, and held that the prior convictions were not an absolute legal bar to an excessive force claim.  In Lora-Pena, a § 1983 action,[4] the plaintiff was convicted of resisting arrest and assaulting federal officers during a criminal trial in federal court.  Lora-Pena v. Federal Bureau of Investigation, 529 F.3d 503, 505 (3d Cir. 2008).  During the criminal trial, the arresting officers testified that the plaintiff had scratched, clawed, and punched them and had "us[ed] his two pit bulls to assault two deputy United States Marshals."  Id.  One arresting officer admitted that he had struck the plaintiff, but only to the extent necessary to subdue him.  Id.  At the conclusion of the trial, the court did not ask the jury to decide whether the officers had used excessive force when they arrested the plaintiff.  Id. at 506.  In a subsequent § 1983 action, the plaintiff alleged that the officers used excessive force during the arrest because they "repeatedly punched and kicked him after he fell to the floor."  Id. at 505.  The Third Circuit found that because "the question of whether the officers used excessive force was not put before the jury[,] ... [the plaintiff's] convictions for resisting

---

[4]     Although Lora-Pena involved both § 1983 and Bivens claims, see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), the Third Circuit analyzed the claims together.  Lora-Pena, 529 F.3d at 505 n.2.

arrest and assaulting officers would not be inconsistent with a holding that the officers, during a lawful arrest, used excessive (or unlawful) force in response to his own unlawful actions." Id. at 506. The Third Circuit concluded that because the convictions and the excessive force claim were not inconsistent, Heck did not bar the plaintiff's claims. Id.

In so doing, the Third Circuit found that it is conceivable that a law enforcement officer, acting within the scope of his official duties, may use force that is excessive in effectuating a lawful arrest. Id. (citing Nelson v. Jashurek, 109 F.3d 142, 145-146 (3d. Cir.1997)). In Nelson, the plaintiff had been convicted in state court of resisting arrest. Under Pennsylvania law, to convict the plaintiff, the jury had to find that the officer involved "was justified in using 'substantial force.'" Nelson, 109 F.3d at 145. In reversing the district court's grant of summary judgment, the Third Circuit determined that "the fact that [the defendant] was justified in using 'substantial force' to arrest Nelson does not mean that he was justified in using an excessive amount of force and thus does not mean that his actions in effectuating the arrest necessarily were objectively unreasonable." Id.

Thus, just as the defendants in Lora-Pena and Nelson could have reacted to the plaintiff's illegal conduct with excessive force, it is possible that Defendants in this matter reacted to Roberts's illegal conduct with excessive force. Because Roberts's conviction in state court is not inconsistent with a finding that Defendants used excessive force to arrest him, Heck does not bar Roberts's § 1983 claim. Nonetheless, to prevail on such a claim, Roberts must still meet an exacting threshold. "In order to succeed on his excessive force claim, [Roberts] must still show that the officers' actions were unreasonable in light of the circumstances of the arrest." Lora-Pena, 529 F.3d at 506. This he cannot do.

12

<u>Excessive Force Claim</u>

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." <u>Plumhoff v. Rickard</u>, ___ U.S. ___, 134 S. Ct. 2012, 2020, 188 L.Ed. 2d 1056 (2014). "[D]etermining the . . . reasonableness of a particular seizure . . . 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" <u>Id.</u> (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances. <u>Graham</u>, 490 U.S. at 388, 394 (explaining that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). This reasonableness inquiry is an objective one; it is not a question of subjective intent. <u>Graham</u>, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

The <u>Graham</u> Court instructed that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> at 396. In particular, the Court cautioned that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396-397. It is also

well-settled that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.  In the Fourth Amendment context, the use of deadly force is not excessive if an objectively reasonable officer in the same circumstances would have believed that an individual "posed a 'threat of serious physical harm either to the officer or others.'"  Estate of Bennett v. Wainwright, 548 F.3d 155, 175 (1st Cir. 2008) (quoting Tennessee v. Garner, 471 U.S. 1, 12, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).

As correctly noted by Defendants, there are two recent United States Supreme Court cases which involve facts similar to this matter.  In Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686, (2007), the Supreme Court held that an officer's attempt to terminate a dangerous high-speed car chase that threatened the lives of innocent bystanders did not violate the Fourth Amendment, even when it placed the "fleeing motorist at risk of serious injury or death." Id. at 386.  In that case, the officer terminated a high-speed pursuit of the fleeing vehicle by applying his push bumper to the rear of the fleeing vehicle, causing it to leave the road and crash.  Id. at 375.  The fleeing motorist was rendered a quadriplegic.  Id.  The Supreme Court held that because the car chase initiated by the fleeing motorist posed a substantial and immediate risk of serious physical injury to others, the officer's attempt to terminate the chase by forcing the fleeing motorist off the road was reasonable and did not violate his Fourth Amendment rights.  Id. at 384-386.

More specifically, the Supreme Court, in judging whether the police officer's actions were reasonable, considered the risk of bodily harm that the officer's actions posed to the fleeing motorist in light of the threat to the public that the officer was trying to eliminate.  Id. at

14

383.   The Supreme Court concluded that it was

> appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was [the fleeing motorist], after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the officer] confronted.  Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to stop. By contrast, those who might have been harmed had [the officer] not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for [the officer] to take the action that he did.

Id. at 384.

More recently, in Plumhoff v. Rickard, ___ U.S. ___, 134 S. Ct. 2012, 2020, 188 L. Ed. 2d 1056 (2014), the Supreme Court held that police officers acted reasonably in using deadly force when they attempted to terminate a high speed chase by firing their weapons at the suspect's car.  The facts of Plumhoff are actually quite similar to the facts in the matter before the court.  The plaintiff (Rickard) in the Plumhoff case, like Roberts in this case, was initially pulled over for a traffic violation, but then sped away in his vehicle.  Id. at 2017.  Rickard took the officers on a high speed pursuit, reaching speeds over 100 miles per hour.  Id.  Rickard's vehicle eventually struck at least one police cruiser, and spun out into a parking lot.  Id.  In danger of being cornered in the lot, Rickard put his car into reverse "in an attempt to escape."  Id.  As Rickard did this, the police officers exited their vehicles, and approached his vehicle with weapons drawn in an attempt to get him to stop.  Id.  Rickard, much like Roberts in this case, did not stop, and, instead, floored the accelerator, and spun the tires on his vehicle in an attempt to get away.  Id.  Officer Plumhoff fired three shots into Rickard's vehicle.  Id.  Despite shots being fired, Rickard got his vehicle free, reversed, and drove onto another street, forcing an officer to

step out of the way to avoid being hit by the Rickard vehicle.  Id. at 18.  As Rickard continued

fleeing down the street, an additional twelve shots were fired by the police officers towards his

vehicle.  Id.  Rickard lost control of his vehicle and crashed into a building.  Id.  Both Rickard

and his passenger died as a result of a combination of gunshot wounds and injuries sustained

during the crash.  Id.

      Rickard's estate averred that (1) the officers were not entitled to use deadly force

to terminate the chase, and (2) even if they were permitted to discharge their weapons, they went

"too far" when they fired as many rounds as they did.  Id. at 2021.  The Supreme Court disagreed,

concluding that "it is beyond serious dispute that Rickard's flight posed a grave public safety

risk, and . . . the police acted reasonably in using deadly force to end that risk."  Id. at 2022.  In

justifying this determination, the Supreme Court noted that

> the chase in this case exceeded 100 miles per hour and lasted over
> five minutes. During that chase, Rickard passed more than two
> dozen other vehicles, several of which were forced to alter course.
> Rickard's outrageously reckless driving posed a grave public safety
> risk. And while it is true that Rickard's car eventually collided with
> a police car and came temporarily to a near standstill, that did not
> end the chase. Less than three seconds later, Rickard resumed
> maneuvering his car. Just before the shots were fired, when the
> front bumper of his car was flush with that of one of the police
> cruisers, Rickard was obviously pushing down on the accelerator
> because the car's wheels were spinning, and then Rickard threw the
> car into reverse 'in an attempt to escape.' Thus, the record
> conclusively disproves respondent's claim that the chase in the
> present case was already over when petitioners began shooting.
> Under the circumstances at the moment when the shots were fired,
> all that a reasonable police officer could have concluded was that
> Rickard was intent on resuming his flight and that, if he was
> allowed to do so, he would once again pose a deadly threat for
> others on the road. Rickard's conduct even after the shots were
> fired—as noted, he managed to drive away despite the efforts of
> the police to block his path—underscores the point.

16

Id. at 2021-2022.  Further, with respect to the estate's contention that too many rounds were fired, the Supreme Court held that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."  Id. at 2022.

When we compare the facts of this case to those in Plumhoff, we reach the same conclusion -  Roberts's flight posed a grave public safety risk to others, especially the police officers on the scene, and the police officers, in turn, acted reasonably in using deadly force to end the risk that was created by Roberts.  As more fully detailed above, after receiving information that Roberts was highly intoxicated, Officer Hutchinson observed Roberts driving his vehicle erratically, and initiated a traffic stop.  Despite an initial refusal to stop, Roberts did eventually pull his vehicle over.  However, when Officer Hutchinson approached the Roberts vehicle on foot, Roberts refused to turn off his engine, and, instead, drove away at a high rate of speed.  Officer Hutchinson began a pursuit of the Roberts vehicle, reaching speeds of approximately ninety miles per hour.  Because of Roberts's dangerous driving, Officer Hutchinson temporarily broke off his pursuit.

The officers then observed the Roberts vehicle hiding on a gravel roadway (Schmecks Lane) in a residential area, and Officer Ramirez turned on his spotlight, directing it at the Roberts vehicle.  Immediately thereafter, Roberts began to drive his vehicle down Schmecks Lane.  Officer Ramirez followed Roberts, sounding his air horn and emergency siren.  Roberts did not stop his vehicle.

Roberts proceeded to drive his vehicle into a residential backyard, and got stuck in a flower bed.  Several officers, including Officers Ramirez, Santiago, Dinger, and Sneeringer,

17

exited their police vehicles with their weapons drawn, and began walking towards the Roberts vehicle, surrounding it.  Instead of obeying the officers' verbal commands to shut off his vehicle, Roberts revved the engine in an attempt to free his vehicle.  All of the officers continued to give Roberts verbal commands, instructing him to get out of the vehicle, and show his hands, but Roberts continued to rev the engine, causing the front wheels of his vehicle to spin.  Roberts's vehicle proceeded to gain traction, and once freed, Roberts drove his vehicle directly at Officer Ramirez, Officer Dinger, and Officer Sneeringer, putting them in fear of being struck.  Officer Dinger, in an attempt to disable Roberts's vehicle, fired shots at the front tire and drive train. Officer Ramirez, in fear of being struck by Roberts, jumped out of the way of the moving vehicle, and fired shots aimed towards the driver's side of the vehicle.  Roberts continued to drive his vehicle back up Schmecks Lane.

At this time, Officers Cortazzo, Kennedy, and Niebel, arrived on the scene in an unmarked Ford Explorer.  Officer Cortazzo was driving.  As they proceeded down Schmecks Lane, they heard gunshots fired.  Officer Kennedy believed that his fellow officers were taking on gunfire.  The Roberts vehicle was seen driving directly toward the unmarked Ford Explorer at a speed of approximately 25-35 miles per hour.  Officer Niebel exited the Ford Explorer, and began to run towards the road following Roberts, who was still attempting to flee in his vehicle. Officer Kennedy also exited the Ford Explorer from the driver's side passenger door.  Officer Cortazzo testified that the Roberts vehicle struck the front driver's side of the unmarked Ford Explorer.

Officer Kennedy testified that once he exited the Ford Explorer, he saw the Roberts vehicle coming towards him, and fearing that he would be run over, he jumped up, and

18

landed on the hood of the Roberts vehicle.  The Roberts vehicle continued to move with Officer

Kennedy on the hood of the vehicle.  Fearing for his life, Officer Kennedy fired shots through the

windshield of the Roberts vehicle.  Officer Kennedy then jumped from the hood of the Roberts

vehicle, and fired additional shots at the driver's side of the vehicle as it continued to drive away.

       Roberts drove his vehicle over a metal fence, and crashed into a chicken coop.

Officer Niebel, who observed Roberts sitting up straight inside his vehicle, came up on the

passenger side front, drew his weapon, and repeatedly gave verbal orders directing Roberts to

turn off his vehicle.  Roberts ignored the verbal commands of Officer Neibel, and he continued to

rev the engine in an attempt to free his vehicle as he had done previously.  Officer Kennedy came

up on the passenger side with his weapon drawn.  By this time, Officer Cortazzo had exited the

Ford Explorer, and was proceeding to the rear driver's side of the car.  Upon approaching the rear

of the Roberts vehicle, Officer Cortazzo slipped and fell behind the vehicle.

       Several of the officers at the scene, including Officers Kennedy, Neibel, Cortazzo,

and Ramirez, testified that when Officer Cortazzo was behind the Roberts vehicle, they observed

the rear brake lights and/or reverse lights illuminate on the Roberts vehicle.  Further, we note that

while not all of the officers may have been in a position to notice the illumination of the brake

lights or reverse lights, all of the officers in the vicinity consistently testified that Roberts

continued to rev the engine, presumably in an attempt to free his vehicle as he had done

previously.  Officers Neibel and Cortazzo also testified that they observed the tires on the

Roberts vehicle spinning.

       In fear for his life in the event that Roberts was able to get his vehicle free, Officer

Cortazzo fired shots at the car.  In addition, Officers Kennedy and Niebel, seeing Officer

Cortazzo in danger of being struck or killed if Roberts were able to get free, also fired shots into

the Roberts vehicle.  Once Roberts fell to his right over the center console to passenger driver's

seat and was felt to no longer pose a threat, the officers ceased fire and removed him from the

vehicle.  In light of the foregoing circumstances, the majority of which have been admitted by

Roberts, it is beyond serious dispute that Roberts's flight posed a grave public safety risk, and we

conclude that the police officers acted reasonably in using deadly force to end that risk.

Rickard,134 S. Ct. at 2022.  See also McGrath v. Tavares, 757 F.3d 20 (1st Cir. August 1, 2014);

Thompson v. Mercer, 762 F.3d 433 (5th Cir. August 7, 2014).[5]

           Roberts appears to argue in this matter, as the estate did in Plumhoff, that even if

the use of deadly force was permissible, the officers acted unreasonably in firing so may rounds

at him.  However, for the same reasons set forth by the Supreme Court in Plumhoff, this

argument is without merit.  The Supreme Court held that "if police officers are justified in firing

at a suspect in order to end a severe threat to public safety, the officers need not stop shooting

until the threat has ended."  Plumhoff, 134 S. Ct. at 2022.  In this matter, just like Rickard in

Plumhoff, Roberts never abandoned his attempt to flee during the span of time in which the shots

were fired.  Roberts did not give himself up at any point during the confrontation with police, and

he continued in his attempt to flee up until the very end.  Whenever his vehicle became stuck,

and even despite being surrounded by officers, Roberts continued to rev the engine in an attempt

to free his vehicle, and was successful on at least one occasion.  There was no visible sign of

surrender.  "[A]t the moment when the shots were fired, all that a reasonable police officer could

---

[5]       Both of these United States Court of Appeals cases are consistent with the Supreme Court's
holding in Plumhoff v. Rickard, 134 S. Ct. 2012 (2014), that officers are permitted to use deadly force to stop a
vehicle that is driving at officers and/or placing others in imminent danger of death or serious bodily injury.

have concluded was that [Roberts] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." Plumhoff, 134 S. Ct. at 2022.  Under the circumstances of this case, and in conjunction with the holding in Plumhoff, we find that the officers in this matter were justified to keep shooting until the threat was over.

To the extent that Roberts argues that the angle of the bullets is inconsistent with the officers' testimony, we conclude that he is unable to put forth any competent evidence to support this theory.  Roberts has admitted that he has no independent recollection of the events that occurred on August 31, 2011, and he offers no expert testimony to support his theory with respect to bullet trajectory.  This is simply not permitted under the Federal Rules of Evidence. See Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific, technical, or other specialized knowledge. . . .").

Regardless, we note that Roberts's testimony does not support these assertions. See Defendants' Brief, Exhibit C at 55.  In fact, Roberts initially testified at his deposition that the bullets entered from his back, and traveled at a downward angle.  See Defendants' Brief, Exhibit C at 55, lines 2-3.  A few questions later, and after some prodding by his attorney at the time, Roberts testified that the path of the bullet was from the lower part of his back, and that the bullet came out the higher part in the front.  See Defendants' Brief, Exhibit C at 55, lines 8-12. This inconsistency is not sufficient to defeat summary judgment.

Further, Defendants' expert, Thomas L. Martin, of Crime Forensics, LLC, noted that the medical records pertaining to Roberts's treatment were conflicting.  More specifically, Mr. Martin stated as follows:

21

It is difficult to ascertain with any certainty the actual location of the entrance wounds and if in fact any of the gunshots exited Mr. Roberts' body.  The Medical records indicate that at least one round entered the left upper posterior chest.  There are two different anatomic diagrams that each depict the wounds on Michael Roberts body.  One diagram depicts the wounds to the rear upper back, in the area of the left and right scapulas. . . .  A second diagram within the report conflicts this diagram, and shows wound [sic] at different locations including the mid back area.  It appears that the main injuries incurred by Mr. Roberts were a gunshot wound to his hand that required surgery, and a bullet wound to his left upper back that caused a small pneumothorax.

The EMS reports indicate that many of Michael Roberts wounds [sic] entailed minor bleeding that was simply controlled with *tagaderms*.  Other wounds are not described as being gun shot wounds, but rather abrasions.  The absence of photographs of Mr. Roberts injuries [sic] makes the exact nature of some of the described injuries difficult to understand.  However, the gun shot wounds described to the upper back of Mr. Roberts are consistent with medical reports describing the entrance wounds to his upper back area that resulted in fractures to the left scapula and clavicle.  The injuries to *the R side in the area anterior of the scapula and R mid-back region; lateral aspect*, are described as deep abrasions with no bleeding.  From this description, these injuries do not appear to be penetrating gunshot wounds.

See Defendants' Reply Brief, Exhibit B at 16-17 (emphasis in original).

Moreover, the testimony of Officer Neibel, which has not been disputed by any of the other officers on scene, is that following the crash into the chicken coop, he observed Roberts sitting up straight in the vehicle.  At that time, Roberts was attempting to put the vehicle in gear or change gears, and the engine of his vehicle was still accelerating.  The tires were trying to move, and the Roberts vehicle was rocking back and forth as if it was stuck on something.  Officer Neibel continued to give Roberts orders, and Roberts did not comply.  Officer Neibel then saw the reverse lights of the vehicle go on, and noticed that Officer Cortazzo was in the rear

of the vehicle.  Because he thought the Roberts vehicle was going to back up over Officer

Cortazzo, Officer Neibel fired a series of gunshots through the passenger side front area of the

vehicle towards the driver.  The firing of that series of rounds then caused Roberts to fall to his

right over the center console of the vehicle, and he and the other officers ceased fire.  The

officers maintained a position of cover until they were able to get the passenger side door open,

and pull Roberts from his vehicle.

Qualified Immunity

In any event, even if a constitutional violation was established, Defendants would

still be entitled to summary judgment based on qualified immunity because they did not violate

clearly established law.  The doctrine of qualified immunity serves to protect officers from civil

liability "when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 129

S.Ct. 808, 815, 172 L. Ed. 2d 565 (2009).  In the context of Fourth Amendment claims, qualified

immunity operates to "protect officers from the sometimes 'hazy border between excessive and

acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their

conduct is unlawful."  Saucier v. Katz, 533 U.S. 194, 206, 121 S. Ct. 2151, 150 L. Ed. 2d 272

(2001) (quoting Priester v. Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (internal citation

omitted)).

"An official sued under § 1983 is entitled to qualified immunity unless it is shown

that the official violated a statutory or constitutional right that was clearly established at the time

of the challenged conduct."  Plumhoff, 134 S. Ct. at 2023 (internal quotation marks omitted).

The court makes two inquiries when analyzing qualified immunity. Under the constitutional

inquiry, the court examines "whether the facts that a plaintiff has alleged or shown make out a

23

violation of a constitutional right." <u>Pearson</u>, 129 S. Ct. at 816 (quoting <u>Saucier</u>, 533 U.S. at 201)

(citation omitted).  Second, the court inquires "whether the right at issue was 'clearly established'

at the time of a defendant's  alleged misconduct." <u>Id.</u>  "And a defendant cannot be said to have

violated a clearly established right unless the right's contours were sufficiently definite that any

reasonable official in the defendant's shoes would have understood that he was violating it."

<u>Plumhoff</u>, 134 S. Ct. at 2023.  "[E]xisting precedent must have placed the statutory or

constitutional question confronted by the official beyond debate." <u>Id.</u> (internal quotation marks

omitted).

In <u>Plumhoff</u>, the Supreme Court referred to its 2004 decision in <u>Brosseau v.</u>

<u>Haugen</u>, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam), and confirmed that

"as of February 21, 1999 . . . it was not clearly established that it was unconstitutional to shoot a

fleeing driver to protect those whom his flight might endanger." <u>Plumhoff</u>, 134 S. Ct. at 2023.

The Supreme Court noted that in <u>Brosseau</u>, they "held that a police officer did not violate clearly

established law when [on February 21, 1999] she fired at a fleeing vehicle to prevent possible

harm to 'other officers on foot who [she] believed were in the immediate area, . . . occupied

vehicles in [the driver's] path[,] and . . . any other citizens who might be in the area." <u>Id.</u>

(quoting <u>Brosseau</u>, 543 U.S. at 197).

The Supreme Court went on to say that in order to overcome a qualified immunity

defense in a case where a police officer fired at "a fleeing driver to protect those whom his flight

might endanger," a plaintiff would have to show "at a minimum" either (1) that the officer's

conduct is "materially different from the conduct in <u>Brosseau</u>" or (2) that between February 21,

1999, and, in this case, August 30, 2011, "there emerged either controlling authority or a robust

consensus of cases of persuasive authority that would alter our analysis of the qualified immunity question." Plumhoff, 134 S. Ct. at 2023. (citations omitted).  Roberts cannot demonstrate either.

   The facts in this case are more favorable to the police officers than the facts in Brosseau.  First, the police officer in Brosseau fired at the driver when he "had just begun to flee and . . . had not yet driven his car in a dangerous manner."  Id.  Whereas in this matter, the officers in question fired their weapons during a chase "that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby."  Id.  Further, we note that the suspect driver in Brosseau was not driving towards any police officers when shots were fired, and thus, did not present as imminent of a threat to the police officers as in this case.  In this matter, however, Roberts drove his vehicle directly at Officers Ramirez, Dinger, and Sneeringer, putting them in fear of being struck; subsequently struck Officer Kennedy with his vehicle, and proceeded to drive with him on the hood; and later attempted to continue his flight efforts by revving his engine while Officer Cortazzo was located directly behind the vehicle in a precarious position.  Accordingly, the officers' conduct in this matter is certainly not "materially different from the conduct in Brosseau."  Id.

   In an attempt to overcome the defense of qualified immunity, Roberts relies solely on cases which have held that the use of overly tight handcuffs violates the Fourth Amendment.  See Roberts Brief at 7-8, 10-11.  Based on these line of cases, Roberts asserts that if it is unreasonable to overly tighten handcuffs, then the actions of the Defendants in this matter must also be deemed unreasonable, and the Defendants, based on the overly tight handcuff cases, should have known their conduct was unlawful.

However, as correctly noted by Defendants, the issue for qualified immunity is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.  Good v. Dauphin County Children and Youth Services, 891 F.2d 1093 (1989).  As noted above, several cases have held that the use of lethal force is permissible to stop a fleeing motorist who poses an actual and imminent threat to others.  It is, therefore, irrelevant to our inquiry in this case that Courts have held that overly tight handcuffs may be violative of the Fourth Amendment.  Roberts fails to cite to any case, let alone a "controlling authority or a robust consensus of cases of persuasive authority," that can be said "to have clearly established the unconstitutionality of using lethal force to end a high-speed car chase."  Plumhoff at 2024.  Accordingly, we conclude that Defendants are entitled to qualified immunity for the conduct at issue because they violated no clearly established law.

Officer Kennedy's Counterclaim

Officer Kennedy moves for summary judgment on his asserted counterclaim against Roberts based on the Pennsylvania state tort law claim of assault and battery.  Under Pennsylvania law, an assault occurs when: 1) one acts with the unprivileged intent to put another in reasonable and immediate apprehension of harmful or offensive conduct; and 2) that act does cause such apprehension.  Proudfoot v. C.O. I A. Williams, et al., 803 F. Supp. 1048, 1054 (E.D. Pa. 1992) (citation omitted).  A battery is the actual bodily contact.  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).  A bodily contact is offensive if it would offend a reasonable person's personal sense of dignity.  Id.

26

Officer Kennedy's counterclaim is predicated on the criminal acts giving rise to Roberts's guilty plea to, *inter alia*, aggravated assault and recklessly endangering another person. The definition of aggravated assault, a felony of the first degree as it pertains to this matter, is set forth in 18 Pa.C.S.A. § 2702 as follows:

§ 2702.  Aggravated assault.

(a)  Offense defined.--A person is guilty of aggravated assault if he:

(1)  attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(2)  attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) . . . ;

.         .         .

(c)  Officers, employees, etc., enumerated.--The officers, agents, employees and other persons referred to in subsection (a) shall be as follows:

(1)  Police officer.

See 18 Pa.C.S.A. § 2702.  Pursuant to 18 Pa.C.S.A. § 2705, a person is guilty of recklessly endangering another person, a misdemeanor of the second degree, if he:

recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

See 18 Pa.C.S.A. § 2705.  By pleading guilty to aggravated assault and recklessly endangering another person, Roberts admitted under oath that he: "knowingly caused bodily injury to Officer Kennedy when [he] failed to stop [his] car and hit him."  See Defendants' Motion for Summary

Judgment, Exhibit N, Roberts's Guilty Plea Statement at 3.  Roberts also admitted under oath that during the time he was driving his car, "[he] was intoxicated and failed to stop [his] car after both visual and auditory signals by police to do so" and that while he "attempted to flee [he] endangered the officers" and "could have seriously injured them."  Id.

Roberts does not appear to contest the counterclaim of Officer Kennedy in his responsive brief.  Regardless, because Roberts's guilt has been established beyond a reasonable doubt through entry of his guilty plea and sentence, his liability for Officer Kennedy's counterclaim for assault and battery is established for purposes of these proceedings.  Gibson v. Borough of West Chester, No. CIV.A.02-9089, 2004 WL 203175, * 8 (E.D. Pa. Jan. 12, 2004) (summary judgment granted on compulsory counterclaim for assault and battery where jury found defendant guilty of aggravated assault on police officer for injuries during arrest).

## Conclusion

Defendants City of Reading, Officer Matt Niebel, Officer Wilfredo Ramirez, Officer Christopher Cortazzo and Officer James T. Kennedy's Motion for Summary Judgment on Plaintiff's Claims Against Defendants and the Counterclaim of Officer Kennedy Against Plaintiff will be granted.  At trial, the only remaining issue is the appropriate measure of Officer Kennedy's damages with respect to his counterclaim for assault and battery against Roberts.

An Order follows.